IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., | § | |
| as Broadcast Licensee of the March 8, 2014 | § | |
| "Toe to Toe" Saul Alvarez v. Alfredo Angulo Light | § | |
| Middleweight Championship Fight Program, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 5:17-cv-00162-DAE |
| | § | |
| 1) MANDO'S RIVER SEAFOOD RESTAURANT, | § | |
| INC., individually, and d/b/a CAMARON PELADO | § | |
| SEAFOOD GRILL; | § | |
| 2) PABLO PADILLA, individually, and d/b/a | § | |
| CAMARON PELADO SEAFOOD GRILL; and | § | |
| 3) IRMA PADILLA a/k/a IRMA ROMERO | § | |
| PADILLA, individually, and d/b/a CAMARON | § | |
| PELADO SEAFOOD GRILL, | § | |
| | § | |
| Defendants. | § | |

## APPENDIX TO PLAINTIFF'S MOTION FOR FINAL
## DEFAULT JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

David M. Diaz
Attorney-in-Charge
State Bar No. 24012528
ddiaz@kbdtexas.com
Andrew R. Korn
Of Counsel
State Bar No. 11683150
akorn@kbdtexas.com

THE KORN DIAZ FIRM
4221 Avondale Avenue
Dallas, Texas 75219
(214) 521-8800 – Telephone
(214) 521-8821 – Facsimile

ATTORNEYS FOR PLAINTIFF

<u>TABLE OF CONTENTS</u>

Exhibit "A":    *Affidavit of Thomas P. Riley.*  In addition, the Affidavit includes the following exhibits:

  1.    A copy of the *Closed Circuit Television Agreement* for the Event;

  2.    A copy of the *Affidavit* of Donald Ogle; and

  3.    A copy of the Rate Card for the Event.


Exhibit "B":    *Affidavit of David M. Diaz.*  The Affidavit includes the following Exhibits:

  1.    Resume of David M. Diaz, with Martindale Hubbell rating guide; and

  2.    *Texas Lawyer 2014 Salary and Billing Report* (published in TEXAS LAWYER July 28, 2014 edition) and Jeanne Graham, *The Future of Fees* (published in TEXAS LAWYER July 29, 2013 edition).

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2017, I have mailed by United States Postal Service a copy of this document to the following non-CM/ECF participant:

Mando's River Seafood Restaurant, Inc.   VIA U.S. MAIL & U.S. CERTIFIED MAIL
c/o Pablo Padilla, individually,   RRR# 7016 0910 0000 2578 7113
and as registered agent of   RRR# 7016 0910 0000 2578 7120
Mando's River Seafood Restaurant, Inc.
2918 W. Commerce
San Antonio, TX 78207, and
2610 Johnson Grass
San Antonio, TX 78521

Irma Padilla   VIA U.S. MAIL & U.S. CERTIFIED MAIL
2918 W. Commerce   RRR# 7016 0910 0000 2578 7137
San Antonio, TX 78207, and   RRR# 7016 0910 0000 2578 7144
2610 Johnson Grass
San Antonio, TX 78521

DEFENDANTS

By: /s/ David M. Diaz
David M. Diaz

APPENDIX TO PLANTIFF'S MOTION FOR FINAL
DEFAULT JUDGMENT AND BRIEF IN SUPPORT
x:\804125\Default\Appendix

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., as Broadcast Licensee of the March 8, 2014 "Toe to Toe" Saul Alvarez v. Alfredo Angulo Light Middleweight Championship Fight Program, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 5:17-cv-00162 |
| 1) MANDO'S RIVER SEAFOOD RESTAURANT, INC., individually, and d/b/a CAMARON PELADO SEAFOOD GRILL; 2) PABLO PADILLA, individually, and d/b/a CAMARON PELADO SEAFOOD GRILL; and 3) IRMA PADILLA a/k/a IRMA ROMERO PADILLA, individually, and d/b/a CAMARON PELADO SEAFOOD GRILL, | § § § § § § § § § § § | |
| Defendants. | § § | |

## FED. R. EVID. 902(11) AFFIDAVIT OF THOMAS P. RILEY

| | |
|---|---|
| STATE OF CALIFORNIA | § § |
| COUNTY OF LOS ANGELES | § |

BEFORE ME, the undersigned authority, on this day personally appeared Thomas P.

Riley, who is personally known to me or presented a valid California driver's license to verify

his identity, and who, after first being duly sworn under oath, deposes and states as follows:

　　　1.　　　"My name is Thomas P. Riley.  I am more than 21 years of age; I am of sound

mind; and I am competent to make this Affidavit and to testify to the matters stated herein.

　　　2.　　　The statements contained herein are true and correct and within my personal

knowledge or the knowledge of The Law Offices of Thomas P. Riley and from a review of The

Law Offices of Thomas P. Riley's investigation file for Defendants 1) Mando's River Seafood

Restaurant, Inc., individually, and d/b/a Camaron Pelado Seafood Grill; 2) Pablo Padilla, individually, and d/b/a Camaron Pelado Seafood Grill; and 3) Irma Padilla a/k/a Irma Romero Padilla, individually, and d/b/a Camaron Pelado Seafood Grill (collectively "Defendants") (the "Establishment").

3.      Plaintiff J&J Sports Productions, Inc. ("Plaintiff") hired The Law Offices of Thomas P. Riley to assist Plaintiff with regard to certain infringement matters (including the discovery, investigation and prosecution of claims arising from the theft or piracy of closed-circuit television programming, including the March 8, 2014 "Toe to Toe" Saul Alvarez v. Alfredo Angulo Light Middleweight Championship Fight Program, including undercard and preliminary bouts (the "Event"). The main event and undercard and preliminary fights for the Event included the following bouts: Saul Alvarez v. Alfredo Angulo; Leo Santa Cruz v. Cristian Mijares; Jorge Linares v. Nihito Arakawa; Francisco Vargas v. Abner Cotto; Sergio Thompson v. Ricardo Alvarez; Will Tomlinson v. Jerry Belmontes; Keandre Gibson v. Antonio Wong; Joseph Diaz v. Jovany Fuentes; and Steve Lovett v. Francisco Molina.

4.      Plaintiff is in the business of marketing and licensing commercial exhibitions of pay-per-view closed-circuit prizefight events.  Plaintiff was the only official closed-circuit provider and licensor of the Event for commercial establishments.  Plaintiff possessed the proprietary rights to exhibit and sublicense the right to exhibit the closed-circuit telecast of the Event to commercial establishments, such as Defendants' Establishment.  Plaintiff was licensed to exhibit the Event at closed circuit locations, such as theaters, arenas, clubs, lounges, restaurants and other commercial establishments throughout the State of Texas.  A true and correct copy of the *Closed Circuit Television License Agreement* for the Event is attached hereto

as Exhibit "A-1" and incorporated herein. Commercial locations that were licensed to carry and broadcast the Event were required to have a valid license agreement from Plaintiff.

     5.     In Texas, because Plaintiff held the exclusive license to sub-license the Event to commercial establishments, the Event was legally available to commercial establishments only through an agreement with Plaintiff.

     6.     The transmission of the Event originated via satellite. In order to safeguard against the unauthorized interception or receipt of the Event, the interstate satellite transmission of the Event was electronically coded or scrambled and was not available to or intended for the use of the general public. If a commercial establishment was authorized by Plaintiff to receive the Event, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal or the establishment's cable or satellite provider would be notified to unscramble the reception of the Event for the establishment, depending upon the establishment's equipment and provider.

     7.     Domestic commercial establishments, which contract with us, were required to pay Plaintiff a commercial sublicense fee to broadcast the Event. This sublicense fee for the Event was based on the capacity of the establishment and varies for each event. For example, for this particular event, if a commercial establishment had a maximum fire code occupancy of 200 persons, the commercial sublicense fee would have been $1,600.00. *See* the *Rate Card* for the Event attached hereto as Exhibit "A-3".

     8.     On March 8, 2014, the night of the Event, my records indicate that the auditor observed the Event being telecast to the patrons of the Defendants' Establishment (specifically the bout between Jorge Linares and Nihito Arakawa). A true and correct copy of the *Affidavit* of Donald R. Ogle regarding the Event being broadcast in Defendants' Establishment is attached

hereto as Exhibit "A-2" and incorporated herein.  Thus, my records indicate that on March 8, 2014, without authorization from Plaintiff and without paying the required commercial license fee to Plaintiff, Defendants intercepted and received or assisted in the interception and receipt of the transmission of the Event and broadcasted, or assisted in the broadcast of, the Event to the patrons of Defendants' Establishment.

9.     Because Defendants did not purchase the Event from Plaintiff and were not authorized to receive the Event, Plaintiff did not provide Defendants or Defendants' Establishment with any electronic decoding equipment, nor did Plaintiff provide Defendants or Defendants' Establishment with any satellite coordinates necessary to receive the signal to broadcast the Event.  Plaintiff did not notify any cable or satellite provider providing service to Defendants' Establishment to unscramble the reception of the Event for the Establishment.

10.     In order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as using an unauthorized decoder or satellite access card, obtaining cable or satellite service and illegally altering the cable or satellite service to bring the signal of the Event into the establishment, or moving an authorized decoder or satellite card from its authorized location to the commercial establishment.  Defendants could not have obtained the transmission of the Event had Defendants not undertaken specific wrongful actions to intercept, receive and/or exhibit the telecast of the Event.

11.     In addition to lost licensing fees, Defendants' patrons purchased food and/or drinks while viewing the Event.  But for Defendants' pirating of the Event, its patrons would have had to view the Event at a commercial establishment authorized by Plaintiff to receive and exhibit the transmission.

12.     As a result of theft by the Defendants and others, Plaintiff has lost and will continue to lose as customers, legitimate commercial establishments which are unwilling and financially unable to compete with those unauthorized commercial establishments, such as Defendants' Establishment, which steal sports and other closed-circuit programming.  Because these unauthorized commercial establishments offer the stolen programming to its patrons for no fee or for a fee which is less than the authorized establishments may have charged, the legitimate commercial establishments with the right to broadcast closed-circuit programming cannot attract paying customers.  As a result, the authorized commercial establishments fail to recover the sublicense fees that they paid, lose patrons and incur financial loss.  When an unauthorized commercial establishment advertises the availability of the pirated programming, the number of patrons at the unauthorized commercial establishment increases and, as a result, Plaintiff and the authorized commercial establishments suffer additional loss.

13.     A major source of Plaintiff's revenue is the sublicense fees which it charges to authorized commercial establishments of the right to broadcast closed-circuit sports and entertainment programming, such as the Event.  Defendants' actions have eroded the base of Plaintiff's customers.  Each patron of Defendants' Establishment was lost as a patron of authorized broadcasts.  But for Defendants' unauthorized broadcast of the Event, all or some of the patrons of Defendants' Establishment would have become patrons of authorized establishments, which encourages authorized establishments to continue to purchase additional events.

14.     Further, Plaintiff has suffered damage to their goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event.  When negotiating sublicense fees, Plaintiff generally represents to legitimate commercial

establishments the location of other authorized commercial establishments licensed to receive the programming.  Therefore, when an unauthorized commercial establishment intercepts, receives and exhibits closed-circuit programming, such as the Event, Plaintiff's reputation and goodwill suffers from what appears like a misrepresentation.  Furthermore, an incalculable damage is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which pirate closed-circuit programming, such as the Event.

15.     The continued viability of Plaintiff as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event.  If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming.

16.     Because the Event was broadcast to the patrons of Defendants' Establishment, Defendants' only purpose and intent in exhibiting the Event was to secure a private financial gain and direct commercial purposes by misappropriating Plaintiff's licensed exhibitions and infringing upon Plaintiff's rights while avoiding proper payment to Plaintiff.

17.     As a willful violator of the Communications Act, Defendants must be held accountable for a substantial amount above the market value of the sublicense fees to broadcast the Event.  Otherwise, other commercial establishments would be encouraged to violate the law knowing the full extent of its liability would not exceed what they would have to pay for a license on the open market.  The award of damages must be sufficiently significant to deter

AFFIDAVIT OF THOMAS P. RILEY
x:/804125/Pleadings/Affidavit - Riley

Defendants and other unauthorized commercial establishments from pirating protected communications.

18.     I am a custodian of records for The Law Offices of Thomas P. Riley.  Attached hereto are Exhibits "A-1", "A-2" and "A-3" that are business records of The Law Offices of Thomas P. Riley.  These records are kept by The Law Offices of Thomas P. Riley in the regular course of business, and it was the regular course of business of The Law Offices of Thomas P. Riley for an employee or representative of The Law Offices of Thomas P. Riley, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.  The records attached are the original or exact duplicates of the original."

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

THOMAS P. RILEY
THE LAW OFFICES OF THOMAS P. RILEY, FOR
J&J SPORTS PRODUCTIONS, INC.

SUBSCRIBED AND SWORN TO BEFORE ME, an officer authorized to administer oaths, on this __23__ day of March, 2017.

Notary Public, in and for the State of California

My Commission Expires:

__April 13 2019__

Printed Name of Notary Public

AFFIDAVIT OF THOMAS P. RILEY
x:/804125/Pleadings/Affidavit - Riley

THOMAS RAMIREZ II
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2106951
LOS ANGELES COUNTY
My Comm. Exp. April 13, 2019

Page 7

# EXHIBIT "A-1"

### GOLDEN BOY PROMOTIONS, LLC
626 Wilshire Boulevard, Suite 350
Los Angeles, California 90017
(213) 489-5631 (Telephone)
(213) 489-4057 (Facsimile)

February 20, 2014

J&J Sports Productions, Inc.
2380 South Bascom Avenue, Ste. 200
Campbell, CA 95008
Attention: J.M. Gagliardi

RE:  CLOSED CIRCUIT TELEVISION LICENSE AGREEMENT

Saul Alvarez vs. Alfredo Angulo , plus selected undercard bouts
(fighters subject to change)

March 8, 2014
MGM Grand Garden Arena, Las Vegas, NV

Gentlemen:

This will confirm the terms of our agreement whereby GOLDEN BOY
PROMOTIONS, LLC (referred to herein as "Promoter") hereby grants to J&J
Sports Productions, Inc ("J&J" or "you" or "Licensee") the exclusive license to
exhibit, only within the fifty states of the United States of America (excluding
Puerto Rico), with the exception of Clark County Nevada which shall be "blacked
out" unless Licensee receives written authorization by Promoter to exhibit the
Event (as that word is defined herein) within Clark County. (the "Territory"),
Promoter's live telecast of the bout described above and accompanying undercard
matches (the "Event"), simultaneously with the Event, only at commercial closed-
circuit television exhibition outlets, such as theaters, bars, clubs, lounges,
restaurants and the like, each with a fire code occupancy capacity not to exceed
persons per outlet (except for casinos), located within the Territory. The exhibition
rights granted herein do not include any rights in Mexico, Canada, or to
transmissions to hotel guest rooms, in-flight aircraft or other transportation
facilities.

1.  License Fee. As full and complete compensation for the rights granted
you by Promoter, you shall pay to Promoter the license fee calculated as follows:

Th                                                as provided in
Paragraph                                         of the amount of all
gross revenues received
                which Licensee receives from all closed circuit
television exhibitions of the Event in the Territory.

1

    (a)    All amounts which are to be deducted or withheld by your sublicensee exhibitors, sales agents or distributors from payments to you or your sublicensees shall be subject to the mutual agreement of Promoter and Licensee but shall not exceed ____ of gross revenues from each outlet from exhibition of the Event.

    (b)    The calculation of gross revenues under this Paragraph shall not include the amount of any fees or taxes referenced in Paragraph 12 of the attached Closed Circuit Television Standard Terms and Conditions paid or required to be paid by Licensor.

    (c)    In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

    (d)    You shall be entitled to deduct and withhold, for advertising and publicity purposes, ____ of gross revenues from exhibition locations which you license directly to operators without any commission or distribution fee to third party sales agents or distributors.

    (e)    Promoter shall be responsible for the cost of advertising materials, such as posters, press kits and slides, in amounts and quantities to be mutually agreed upon by Promoter and Licensee. In the event that Promoter fails to provide an adequate amount of posters, advertising slicks, press kits, etc., then Licensee shall be entitled to ____ toward such expenses.

    **Payment of all license fee amounts in excess of the Minimum Financial Guarantee shall be due and payable to Golden Boy Promotions, LL ____ business days after the Event.**

    2.    <u>Minimum Financial Guarantee</u>. As a minimum guarantee and non-refundable advance against the monies due to Promoter pursuant to Paragraph 1 of this agreement, Licensee shall pay to Promoter the ____ by delivery to Golden Boy Promotions, LLC not later than March 8, 2014 by either:

    (a)    a certified check or bank cashier's check payable to Golden Boy Promotions, LLC in such amount; or

    (b)    an irrevocable letter of credit payable to Golden Boy Promotions, LLC in such amount, subject to collection. Such letter of credit shall be collateral security for your payment of such minimum financial guarantee, shall be issued or confirmed by a member bank of the U.S. Federal Reserve System, which bank shall be subject to the advance approval of Promoter in its discretion.

    3.    <u>Compatible Decoding Equipment</u>. You and your sublicensees shall be responsible to obtain, at your or their cost and expense, either

      (a)    Authorization to receive the Event through the services of one or more direct satellite suppliers ("DSS"), such as DirecTV or Echostar, to be selected by you; or

      (b)    If Promoter licenses TVN to distribute the Event by C-Band and so notifies Licensee, authorization to receive the Event through TVN.

DSS and TVN, if applicable, shall be responsible for the encoding and decoding of their retransmitted signals. You shall not charge decoder rental or authorization fees to your sublicensees in excess      per decoder or authorization. Any additional equipment charges to your sublicensees shall be at your cost.

    4.    Addressing of Decoders.

      (a)    Promoter, at its sole cost, shall deliver the encrypted transmission of the video and audio signal of its telecast of the Event either (1) to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and TVN, for redistribution to your designated outlets or (2) by fibre optic cable to a delivery point at which the signal is capable of being received by DSS and TVN, for redistribution to your designated outlets. DSS and TVN, if applicable, shall have the responsibility to address and authorize decoders for your authorized sublicensees. You shall be responsible for all charges for addressing and authorizing your sublicensees.

      (b)    Promoter shall have no responsibility for your decoder authorization fees, and Promoter shall have no responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS or TVN.

      (c)    You shall instruct DSS and TVN, if applicable, to provide directly to Promoter, on the     business day after the Event Date, their complete final authorization reports which shall indicate the name, address and city of each authorized outlet and the decoder number for each authorized outlet. You shall also instruct any cable television system which you may retain to authorize outlets, and you shall instruct any of your sublicensees which retain cable systems for such purpose, to provide Promoter with the same reports of authorized outlets on the business day after the Event Date.

    5.    Pay-Per-View Exhibitions.

      You acknowledge that Promoter shall license the live cable television and direct broadcast satellite television exhibition of the Event in the Territory on a residential pay-per-view basis and that you shall have no interest or participation in such pay-per-view exhibition or any other exploitation of the Event, other than commercial closed circuit television exhibition rights granted to you as set forth herein.

6.   Anti-Piracy.

.   Licensee shall have the exclusive right to commence or settle any claim or litigation arising out of the alleged piracy, use or proposed use of the closed circuit television telecast in the Territory; provided that in the event of any unauthorized distribution of the Event by iN Demand, LLC or its affiliates (collectively, "iN Demand"), iN Demand's liability shall be limited to an amount equal to          times the applicable closed circuit commercial rate card, unless iN Demand or the applicable system (or their employees or agents) has: (i) marketed or in any way sought to sell the Event to any unauthorized customers; or (ii) authorized such distribution in a manner that was either intentional, knowing, reckless or grossly negligent, in which case such limit on liability shall not apply. Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory, after payment of reasonable legal fees, costs and disbursements, shall constitute gross revenues from the Event, to be shared by Promoter and Licensee as set forth herein. Licensee shall advance any required legal fees and disbursements, subject to recoupment from any applicable recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder, and you shall not assign these anti-piracy rights to any other party, without the prior written consent of Promoter. Notwithstanding the foregoing, in the event that you elect not to pursue any claim or litigation arising out of the alleged piracy, use or proposed use of the closed circuit television telecast in the Territory, you shall, upon Promoter's request, assign the exclusive right to pursue such claims or litigation to Promoter. In the event of such an assignment, Promoter shall be solely responsible for payment of all legal fees and disbursements and shall be entitled to retain as its exclusive property any and all recoveries therefrom, and Licensee shall be released and relieved of and from any anti-piracy obligations referenced above in connection with the applicable claims or litigation.

7.   Private Showings. Promoter shall have the right, at its cost and expense and upon written notice to you, to conduct or authorize others to conduct up complimentary private showings of the telecast of the Event within the Territory, with no admission charge and no advertising or advance publicity for such private showings.

8.   Attachments. Annexed to this agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

(a)   Closed Circuit Television Sublicense Agreement which you and your sublicensee shall complete and sign with respect to each closed circuit television outlet you may sublicense.

(b)   Closed Circuit Television Standard Terms and Conditions which shall apply to this agreement as well as to the Closed Circuit Television Sublicense

4

Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

9.   Defaults.

(a)   Your failure to deliver the Minimum Financial Guarantee as provided in Paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this agreement shall permit Promoter, in addition to all of its other rights and remedies, to cancel this agreement with you at any time without any further liability or obligation to you and to retain all monies paid to Promoter prior to such cancellation, provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter must (i) provide Licensee with written notice specifying such default and (ii) if and to the extent that time reasonably permits prior to the Event, provide Licensee with up          days after Licensee's receipt of such default notice within which to cure such default.

(b)   If, in violation of the provisions of this agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of      persons (except casino locations), then Licensee shall remit upon demand by Promoter the license fee for such outlet as provided in Paragraph 1.

10.   No Packaging with Other Events.

You shall not sublicense closed-circuit television rights to the Event to exhibitors as part of a package which includes other boxing programs or bouts not included in this Event without the prior written consent of Promoter.

11.   Reports, Collection and Accounting.

(a)   You shall be responsible for collection of all monies from outlets, and shall make all payments and provide all reports and shall provide Promoter with copies of all reports received from sublicensed outlets. You shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deductions, set-offs or holdbacks whatsoever, except as otherwise provided herein.

(b)   You shall also provide separate reports no later than      business days following the Event, including the name, location and license fee for each closed circuit exhibition outlet.

(c)   Promoter's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to the Event and after the Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

All checks shall be payable to, and contracts and reports shall be sent to:

5

Golden Boy Promotions, LLC
626 Wilshire Boulevard, Suite 350
Los Angeles, California 90017
Attn: Raul Gutierrez

    12.   Entire Agreement. This agreement supercedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. The laws of the State of California applicable to contracts executed and to be fully performed in the State of California shall govern this agreement, and execution of this agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction and venue of the State Courts and United States Courts sitting in the County of Los Angeles, State of California and to service of process pursuant to applicable sections of California law with respect to matters arising under such agreement.

Very truly yours,

GOLDEN BOY PROMOTIONS, LLC

By: _____
Authorized Signature

    Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Television License Agreement shall not become effective unless and until Promoter has accepted and signed this agreement and returned one copy to you.

ACCEPTED AND AGREED:

J&J Sports Productions, Inc.

By: _____

Title: PRESIDENT

6

# EXHIBIT "A-2"

STATE OF TEXAS

COUNTY OF BEXAR


## AFFIDAVIT

I, the undersigned, being duly sworn according to law deposes and says, that on March 8, 2014,

at 9:40 p.m., I entered the Camaron Pelado Seafood Grill located at 2918 West Commerce Street,

San Antonio, Texas 78207. I paid a cover charge of $ 0.00 to enter this establishment. I ordered

two coca colas and an order of bean and cheese nachos from the Waitress who was described as

a Hispanic female, approximately 5'5" tall, in her mid to late forties, approximately 160 to 170

pounds with long black hair in a ponytail, wearing prescription glasses. The Waitress' name was

Naomi who was wearing black pants, a blue short sleeve shirt and a black apron.

I observed 4 televisions located inside this establishment. The televisions can be described as

follows: I could only I.D. the TV in the right corner in front of me where I was sitting; the size of

the TV was a Samsung approximately 55". Most of the TV's in the establishment appeared to be

55". Located: the first TV was located in the center behind the bar; the second TV was located

at the far left corner of the restaurant as you enter; the third TV was located at the far right corner

of the restaurant as you enter and in front of me where I was sitting; the forth TV was located on

a wall on the left side mid way of the restaurant as you enter.

At the time I was inside the above establishment, I observed the following program on the above

televisions: As I made my way into the restaurant, I sat down at a table which had two chairs in

the far right end of the restaurant. The waitress brought two menus and placed them on the table.

I ordered two coca colas and an order of bean and cheese nachos from the waitress. As I looked

up at the TV in front of me I got my recording device out and started recording the fight.  The fight was in the 9th round with approximately one minute forty seven seconds (1:47) remaining on the clock.  I saw Linares (wearing green trunks with white strips) and Arakawa (wearing black trunks with gold strips) Linares and Arakawa were exchanging blows with one another.  Arakawa had Linares in a head lock and the Referee lifted Arakawa's right hand and separated them.  Once separated, Linares and Arakawa began exchanging blows with each other again.  Arakawa threw a strong left hook which missed Linares, Arakawa backed Linares up to the ropes where they continued to exchange blows with each other.  The fight became very intense as I continued to record this round.  The waitress brought 2 coca colas, 2 cups with ice and chips and salsa.  I also recorded the 10th round with approximately two minutes twenty-nine seconds (2:29) remaining on the clock.  The waitress brought the nachos to my table.

I also observed the following distinguishing items inside the establishment: I observed an alcohol display case hanging above the center of the bar area where customers sit.  The display case had various bottles of alcohol; the bottom had glass holders and glasses hanging from it.  I also observed a Lifesaver ring affixed to the far right side of the wall; the ring was blue and white with a white rope on the outer ring.  I also observed a black ball light near the back center of the restaurant.

This establishment rates Fair.  The capacity of this establishment is approximately 80 people.  At the time of my appearance I counted the number of patrons three (3) separate times.   The head counts were 78, 86, and 87.  I left the above establishment at 10:10 p.m. on March 8, 2014.

I also observed the following Texas license plates in the parking lot:

up at the TV in front of me I got my recording device out and started recording the fight.  The fight was in the 9th round with approximately one minute forty seven seconds (1:47) remaining on the clock.  I saw Linares (wearing green trunks with white strips) and Arakawa (wearing black trunks with gold strips) Linares and Arakawa were exchanging blows with one another.  Arakawa had Linares in a head lock and the Referee lifted Arakawa's right hand and separated them.  Once separated, Linares and Arakawa began exchanging blows with each other again.  Arakawa threw a strong left hook which missed Linares, Arakawa backed Linares up to the ropes where they continued to exchange blows with each other.  The fight became very intense as I continued to record this round.  The waitress brought 2 coca colas, 2 cups with ice and chips and salsa.  I also recorded the 10th round with approximately two minutes twenty-nine seconds (2:29) remaining on the clock.  The waitress brought the nachos to my table.

I also observed the following distinguishing items inside the establishment: I observed an alcohol display case hanging above the center of the bar area where customers sit.  The display case had various bottles of alcohol; the bottom had glass holders and glasses hanging from it.  I also observed a Lifesaver ring affixed to the far right side of the wall; the ring was blue and white with a white rope on the outer ring.  I also observed a black ball light near the back center of the restaurant.

This establishment rates Fair.  The capacity of this establishment is approximately 80 people.  At the time of my appearance I counted the number of patrons three (3) separate times.   The head counts were 78, 86, and 87.  I left the above establishment at 10:10 p.m. on March 8, 2014.

I also observed the following Texas license plates in the parking lot:

Date: __3/14/2014__

_____
Signature of Investigator

__Donald R. Ogle_____
Name of Investigator  (Printed)

████████████████████████████████
Investigative Agency

███████████████_____
Telephone Number of Agency

## <u>NOTARY</u>

**STATE OF <u>TEXAS</u>**

**COUNTY OF <u>BEXAR</u>**

Subscribed and sworn to (or affirmed) before me on this __14th__ day of __March__, 2014,

<u>Donald R. Ogle</u>, personally known to me or proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

(SEAL)

NOTARY PUBLIC
JOSE LUIS ALVARADO
My Commission Expires
May 24, 2016
STATE OF TEXAS

_____
Signature

# EXHIBIT "A-3"



**CALL TO ORDER: 1-888-258-7115**

CLOSED CIRCUIT EVENTS LLC.
www.ggsportstv.com

### Saturday, March 8, 2014 9pmET/6pmPT
MGM Grand Garden Arena, Las Vegas, Nevada
**"Toe to Toe"**

# Saul "Canelo" Alvarez
## vs.
# Alfredo "El Perro" Angulo
**WBC super bantamweight title**

| Capacity | Cost |
|----------|------|
| 1– 100 | $1200.00 |
| 101 – 200 | $1600.00 |
| 201 – 300 | $2000.00 |
| 301 – 500 | $2800.00 |

(DirecTV and DishNetwork Activation is included) **ADDITIONAL $25** for HD Feed

Jaime Gallegos
G&G Closed Circuit Events LLC.
National Sales Manager
1-888-258-7115

**1-888-258-7115**
2380 South Bascom Avenue, Suite 200 • Campbell, CA 95008 • Tel: (408) 369-8022 • Fax: (408) 369-8096

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., as Broadcast Licensee of the March 8, 2014 "Toe to Toe" Saul Alvarez v. Alfredo Angulo Light Middleweight Championship Fight Program, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 5:17-cv-00162-DAE |
| 1) MANDO'S RIVER SEAFOOD RESTAURANT, INC., individually, and d/b/a CAMARON PELADO SEAFOOD GRILL; 2) PABLO PADILLA, individually, and d/b/a CAMARON PELADO SEAFOOD GRILL; and 3) IRMA PADILLA a/k/a IRMA ROMERO PADILLA, individually, and d/b/a CAMARON PELADO SEAFOOD GRILL, | § § § § § § § § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF DAVID M. DIAZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David M. Diaz, who is personally known to me or presented a valid Texas drivers license to verify his identity, and who, after first being duly sworn under oath, deposes and states as follows:

1.     "My name is David M. Diaz, I am more than 21 years of age; I am of sound mind; and I am competent to make this Affidavit and to testify to the matters stated herein.

2.     The statements contained herein are true and correct and within my personal knowledge as an attorney licensed to practice law in the State of Texas and as an attorney representing J&J Sports Productions, Inc. ("Plaintiff").

3.    My current resume (along with an attachment explaining Martindale Hubbell's rating system), containing an overview of my experience as an attorney, is attached hereto as Exhibit B-1.

4.    I have attended legal seminars, where the topic discussed was attorneys' fees, including the following:

- *Recovering and Defending Awards of Attorneys' Fees* by Anne Johnson, presented by the Dallas Bar Association Appellate Law Section on February 16, 2017;

- *Settling, Proving and Collecting Attorneys' Fees* by Robert L. Tobey, presented by the Dallas Bar Association Solo & Small Firm Section on January 4, 2017;

- *Attorneys' Fees: Ethics of Billing & Developing Timekeeping Skills* by John L. Trunko, co-sponsored by the Federal Bar Association on December 28, 2016;

- *How to Recover Attorneys' Fees in Texas* by Trey Cox & Jason Dennis, presented by the Texas Lawyer on June 3, 2015;

- *Recent Developments Regarding Attorney's Fees* by Philip Durst, presented by the Dallas Bar Association Appellate Law Section on April 16, 2015;

- *Attorneys' Fees Issues,* presented by the Mesquite Bar Association on October 22, 2013; and

- *Selecting the Best Alternative Fee Arrangement with Outside Counsel,* presented by the Dallas Bar Association Corporate Counsel Section on August 6, 2010.

5.    I have authored articles and spoken at legal seminars where one of the topics discussed was attorney's fees, including: *Perfecting a Judgment 101*, SOAKING UP SOME CLE: A SOUTH TEXAS LITIGATION COURSE; and *Post-Judgment Collection: Getting Your Due from the Devil. How to Collect Like an Angel,* SOAKING UP SOME CLE: A SOUTH TEXAS LITIGATION COURSE; and *Post-Judgment Collection: No Day at the Beach,* SOAKING UP

SOME CLE: A SOUTH TEXAS LITIGATION COURSE (State Bar of Texas, May 12-13, 2016;

May 15-16, 2014; May 16-17, 2013;  May 17-18, 2012; and May 12-13, 2011).  I have set

over two hundred fifty (250) fee agreements for legal services.  I have handled hundreds of

collection cases and attended seminars on debt collection.  Since 2001, my firm has handled

(or is in the process of handling) in excess of six thousand (6,000) anti-piracy cases,

including cases in the federal district courts for the Northern, Southern, Eastern and Western

Districts of Texas.

      6.     Based upon my experience, knowledge and training, reviewing the factors

contained in TEX. DISC. R. PROF. CONDUCT 1.04 and *Johnson v. Georgia Highway Express,*

*Inc.*, 488 F.2d 714 (5th Cir. 1974) with which I am familiar, the work performed in this case,

with which I am familiar, and the *1995 Attorney Billing and Compensation Survey*, it is my

opinion that a one third (33 1/3%) contingent fee is reasonable for the prosecution of this

cause through judgment.  In particular, based on the criminal nature of pirating cable and

satellite transmissions and the defendants' failure to answer this suit, the difficulty of fully

collecting a judgment appears high and the likelihood of fully collecting a judgment appears

low.

      7.     In addition, Courts have recognized that a one-third contingent fee is

reasonable for the prosecution of anti-piracy cases.  *See J&J Sports Prods. v. Casita*

*Guanajuato, Inc.*, 2014 U.S. Dist. LEXIS 35601, *7-8 (W.D. Tex. Mar. 19, 2014) (Sparks,

J.) ("An award equal to one-third of the recovery - $5,280.00 in this case – is reasonable for

cases such as this, and is frequently the measure of attorney's fees used in Communications

Act cases by federal courts in Texas."); *Entertainment by J&J, Inc. v. David Cantu*, No.

3:01-CV-1803-R (N.D. Tex. Dec. 10, 2002) (Buchmeyer, J.) (*Final Judgment*) ("The Court takes judicial notice that an award of attorney's fees in the amount of one-third (1/3) of the damages awarded herein is reasonable and necessary for this type of action."); *see also Entm't by J&J, Inc. v. Nuno*, 2001 U.S. Dist. LEXIS 11050, at *2 (N.D. Tex. Aug. 1, 2001) (Sanders, J.) (*Memorandum Opinion and Order*).[1]

---

[1]  *See also:*

- *J&J Sports Prods., Inc. v. Valencia*, Civil Action No. 3:14-cv-00437-FM (W.D. Tex. Jul. 13, 2015) (Montalvo, J.) (*Order Granting in Part and Denying in Part Plaintiff's Motion for Default Judgment*) (Attorney's fees totaling 33.33% of damages awarded)

- *J&J Sports Prods., Inc. v. Las Palmas Tex Mex & Seafood Private Club, Inc.,* Civil Action No. 4:13-cv-00636-ALM (E.D. Tex. Feb. 9, 2015) (Mazzant, J.) (*Final Default Judgment*) (Attorney's fees totaling 33.33% of damages awarded);

- *J&J Sports Prods., Inc. v. Zavala*; In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-09-1359 (Hoyt, J.) (S.D. Tex. Aug. 28, 2009) (*Final Default Judgment*) (Attorney's fees totaling 33.33% of damages awarded);

- *J&J Sports Prods., Inc., v. Bustillos*, In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No.  H-08-01069, (Apr. 8, 2009) (Harmon, J.) (*Final Default Judgment*) (Attorney fees totaling 33.33 % of damages awarded);

- *Innovative Sports Marketing Inc. v. Gonzalez*; In the United States District Court for the Southern District of Texas, Houston Division Civil Action No. H-07-3279, (Mar. 13, 2009) (Hittner, J.) (*Final Summary Judgment*) Attorney fees totaling 33.33 % of damages awarded);

- *J&J Sports Prods., Inc. v Alvarado*; In the United States District Court for the Southern District of Texas, Houston Division Civil Action No. H-08-0218 S.D.Tex. May 29, 2008) (Lake, J.) (*Final Default Judgment*) (Attorney's fees totaling 33.33% of damages awarded);

- *Garden City Boxing Club, Inc. v. Aguilar*; In the United States District Court for the Southern District of Texas, Brownsville Division Civil Action No. 1:07-cv-98, (Aug. 20, 2008) (Hanen, J.) (*Final Default Judgment*) (Attorney's fees totaling 50% of damages awarded);

- *Garden City Boxing Club, Inc. v. Meza*; In the United States District Court for the Southern District of Texas, Houston Division Civil Action No. H-07-3993; (S.D. Tex. Aug. 29, 2008) (Atlas, J.) (*Final Default Judgment*) (Attorney's fees totaling 33.33% of damages awarded);

- *Garden City Boxing Club, Inc. v. Peña*; Civil Action No. H-05-CV-03088, (S.D. Tex. May 26, 2006) (Ellison, J.) (*Final Default Judgment*) (Attorney's fees totaling 33.3% of damages awarded);

*but see*:

- *Garden City Boxing Club, Inc. v. Lopez*; Civil Action No. H-04-3264, (S.D. Tex. Jun. 17, 2005) (Gilmore, J.) (*Final Default Judgment*) (Attorney's fees totaling 50% of damages awarded);

- *Interforever Sports, Inc. v. Cubides*; Civil Action No. H-06-2417, (S.D. Tex. Dec. 12, 2006) (Lake, J.) (*Final Default Judgment*) (Attorney's fees totaling 42.8% of damages awarded);

8.     The reasonable attorneys' fee of one-third is determined solely on how I perceive the factors listed in TEX. DISC. R. PROF. CONDUCT 1.04 as applied to this case, and not against all my cases, and not using risk shifting or "pooling" between my cases.

9.     Solely in the alternative to the one-third contingent fee sought for the prosecution of this action through the Default Judgment, and for any "*Lodestar* fee" calculation, Plaintiff estimates that attorneys representing Plaintiff in this action reasonably expended or will expend a minimum of four (4) hours on this litigation through the preparation of Plaintiff's Motion for Default Judgment. Based on the factors and documents identified herein, it is my opinion that a blended rate of $250.00 per hour is reasonable for anti-piracy litigation, considering my firm's experience with anti-piracy cases such as this case,[2] for a total fee in the amount of $1,000.00.  In determining the $250 per hour fee, I also considered the *Texas Lawyer 2014 Salary and Billing Report* (published in TEXAS LAWYER July 28, 2014 edition) (a copy of which is attached as Exhibit "B-2").

10.     This $250 per hour fee for prosecution of anti-piracy cases by my law firm has been specifically approved or accepted in the following cases:  *See*

- *J&J Sports Prods., Inc. v. Sacast, Inc.*, Civil Action No. 1:14-cv-00180 (S.D. Tex. May 7, 2015) (Tagle, J.) (*Order*) ("The Court finds $250.00 to be a reasonable hourly rate, at four hours to be a reasonable expenditure of time in this case.");

- *J&J Sports Prods., Inc. v. El Bocadito Inc.*; Civil Action No. H-08-1067, (S.D. Tex. Mar. 31, 2009) (Werlein, J.) *(Final Default Judgment)* (Attorney's fees totaling 25% of damages awarded).

[2] *J&J Sports Prods., Inc. v. Mandell Family Ventures, LLC v. Time Warner Cable, LLC,* 2013 U.S. Dist. LEXIS 89236, *20 (N.D. Tex. Mar. 31, 2013) (Stickney, Mag.) (*Order* [Doc. 71]) ("David Diaz and Andrew Korn, both of whom have a great deal of experience with anti-piracy cases, as well as other civil litigation areas."); *See J&J Sports Prods., Inc. v. Live Oak County Post No. 6119 VFW,* 2009 U.S. Dist. LEXIS 81336 (S.D. Tex. Sept. 8, 2009) ("...Mr. Korn's broad experience in this area of the law."). My firm also has substantial experience in judgment enforcement. *See* Texas Super Lawyers (2009) at p. 84; *cf.* Transcript of Record at 8, *J & J Sports Prods., Inc. v. Guerra,* 2012 U.S. Dist. LEXIS 155802 (S.D. Tex. Oct. 31, 2012) (Ellison, J.) (C.A. No. H-12-945) ("...I feel blessed to have such good attorneys on both sides.").

- *J&J Sports Prods., Inc. v. Lopez*, Civil Action No. 3:14-cv-01551-L (N.D. Tex. Apr. 30, 2015) (Lindsay, J.) (*Memorandum Opinion and Order*) ("The court is familiar with Plaintiff's counsel's law firm and agrees that an hourly rate of $250 is certainly reasonable under the circumstances of this case. The court has awarded this hourly rate in prior cases handled by Mr. Diaz.");

- *J&J Sports Prods., Inc. v. Gonzalez*, Civil Action No. 5:14-cv-00809-DAE (W.D. Tex. Mar. 31, 2015) (Ezra, J.) (*Order Adopting Magistrate Judge's Report and Recommendation*);

- *J&J Sports Prods., Inc. v. Bump Draft, Inc.*, Civil Action No. 5:14-cv-00825-HLH (W.D. Tex. Mar. 20, 2015) (*Order Granting Motion for Default Judgment*) ("The Court finds that the reasonable amount of time devoted to this case was six hours, and that the reasonable hourly fee would be $250.");

- *G&G Closed-Circuit Events, LLC v. 10 De Mayo Mexican Grill and Bar LLC*, Civil Action No. 1:14-cv-00031-RC (E.D. Tex. Dec. 17, 2014) (Clark, J.) (*Order Granting in Part Plaintiff's Motion for Summary Judgment*) ("…Plaintiff requests an award based on a lodestar calculation for its counsel's work for eight hours at an hourly rate of $250.00, for a total of $2,000.00…Based on the undisputed evidence and the case law, the court finds that an award of attorney's fees in the amount of $2,000.00 are reasonable and were necessarily incurred in the prosecution of this case.");

- *J&J Sports Prods., Inc. v. Orellana*; Civil Action No. H-11-574; 2012 U.S. Dist. LEXIS 108084, at *18 (S.D. Tex. Aug. 2, 2012) (Harmon, J.) ("Based on Plaintiff's undisputed evidence (affidavit of David M. Diaz, Ex. B), for six hours of services at the firm's hourly rate of $250.00, the Court awards Plaintiff $1500.00 in reasonable attorney's fees.");

- *Joe Hand Promotions, Inc. v. Garcia*; Civil Action No. 3-11-cv-3212 (N.D. Tex. Aug. 9, 2012) (Boyle, J.) ("The affidavit of David M. Diaz shows that JHP's counsel charges an hourly rate of $250.00 for similar ant-piracy litigation. The Court finds this hourly rate within the usual and customary range charged by attorneys in the Dallas legal community with similar skills and experience for the type of services required in this case. … The Court finds JHP's counsel's hourly rate and time spent providing legal services to be reasonable given the circumstances of this case."); and

- *J&J Sports Prods. v. Valdez*, 2008 U.S. Dist. LEXIS 98603 at *6 (S.D. Tex. Dec. 4, 2008) (Kazen, J.) ("J&J has established by the affidavit of its attorney Andrew R. Korn attorney's fees in the amount of $ 1,500

[six hours x. $250 per hour]. Korn's fees are reasonable and were necessarily incurred in the prosecution of this case.").

11.　　My law firm has represented clients before the Fifth Circuit in cases that resulted in judicial opinions. *See J&J Sports Prods. v. Mandell Family Ventures*, LLC, 751 F.3d 346 (5th Cir. 2014); *Joe Hand Promotions, Inc. v. Chios, Inc.*, 544 Fed. Appx. 444, 2013 U.S. App. LEXIS 10464 (5th Cir. 2013).  Over the period of the last three years, my law firm has prepared, obtained, and delivered more than one hundred twenty (120) writs of execution on several anti-piracy judgments in the Northern, Southern, Western, and Eastern Districts of Texas to the U.S. Marshals Service. Also during this time period, I, or attorneys from my law firm, have personally accompanied and observed Deputy U.S. Marshals levy on these writs of execution. Therefore, I have developed a recent experiential basis for predicting post-judgment fees in anti-piracy cases. Based on my knowledge, skill, experience, training, and education, it is my opinion that the following attorneys' fees are reasonable for each of the following: [3]

　　a)　Ten Thousand Dollars ($10,000.00) in the event a defendant a files a motion to vacate, Rule 60 motion, motion for new trial, motion for reconsideration or other post-judgment, pre-appeal motion that does not result in a reversal of the Judgment obtained in this action;

　　b)　Twenty Five Thousand Dollars ($25,000.00) in the event a defendant files an appeal to the Fifth Circuit Court of Appeals that does not result in a reversal of the Judgment obtained in this action;

---

[3] The Court may award fees for appellate work on a contingent basis.  *See Biliouris v. Sundance Res.*, 2010 U.S. Dist. LEXIS 143214, at *21 (N.D. Tex. Nov. 3, 2010) (Godbey, J.) ("[C]laimants may recover appellate fees in a recovery request presented to the trial court."); *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, No. 3:96-CV-2068, 2000 U.S. Dist. LEXIS 14487, at * 33 (N.D. Tex. Sept. 29, 2000), *vacated on other grounds*, 283 F.2d 282 (5th Cir. 2002) (citing *Norris v. Hartmax Specialty Stores, Inc.*, 913 F.2d 253, 257 (5th Cir. 1990) ("A long and consistent line of Fifth Circuit precedent allows awards of attorney's fees for both trial and appellate work.") (citations omitted)).

c) Five Thousand Dollars ($5,000.00) in the event a defendant files a motion for rehearing or reconsideration in the Court of Appeals that does not result in a reversal of the Judgment obtained in this action;

d) Twenty Five Thousand Dollars ($25,000.00) for making and/or responding to a petition for certiorari to the U.S. Supreme Court that does not result in a reversal of the Judgment obtained in this action;

e) Seventy Five Thousand Dollars ($75,000.00) for an appeal to the United States Supreme Court in the event a petition for certiorari review is granted and does not result in a reversal of the Judgment obtained in this action; and

f) For collection of the Judgment, Two Thousand Five Dollars ($2,500.00) each time Plaintiff obtains a writ of execution, writ of garnishment, writ of attachment or other post-judgment writ.


DAVID M. DIAZ

SUBSCRIBED AND SWORN TO BEFORE ME, an officer authorized to administer oaths, on the 27th day of June, 2017, to certify which witness my hand and official seal.

Notary Public, in and for the State of Texas

Ebony S. Mosley
Printed Name of Notary Public

EBONY S. MOSLEY
NOTARY PUBLIC - STATE OF TEXAS
ID# 130587932
COMM. EXP. 03-28-2020

# EXHIBIT "B-1"

DAVID M. DIAZ
THE KORN DIAZ FIRM
4221 Avondale Avenue
Dallas, Texas 75219
(214) 521-8800 – Telephone
ddiaz@kbdtexas.com

David M. Diaz is a partner in the law firm of The Korn Diaz Firm. David has fourteen years of experience in representing clients in a wide variety of civil law matters. David has litigated cases in both State and Federal courts all across Texas ranging from commercial and civil litigation, appellate, intellectual property litigation, tort litigation, personal injury, libel, slander, DTPA, consumer law, landlord-tenant, breach of contract, business torts, injunctions, Federal Communications Act, and collections, with an emphasis on commercial collection matters.

David was admitted to practice law in Texas in 1999. David is admitted to practice before all state courts in Texas as well as the United States District Court for the Northern, Southern, Western and Eastern Districts of Texas. David has represented clients before the Texas Supreme Court and the following Texas Courts of Appeals:

| | |
|---|---|
| · First District of Texas at Houston | · Sixth District of Texas at Texarkana |
| · Second District of Texas at Fort Worth | · Eighth District of Texas at El Paso |
| · Fourth District of Texas at San Antonio | · Eleventh District of Texas at Eastland |
| · Fifth District of Texas at Dallas | · Fourteenth District of Texas at Houston |

David is a member of the Dallas Bar Association, the Federal Bar Association (Dallas Chapter), the Dallas Hispanic Bar Association, the Mesquite Bar Association, and the Hispanic Forum of Mesquite. In 2011, David served as the President of the Mesquite Bar Association.

David has served as a Commissioner and Vice-Chairman of the Civil Service Commission and Trial (Personnel) Board for the City of Mesquite, Texas. Since 2007, David has been a member of the Dallas Bar Association Home Project Committee (working together with the Dallas Area Habitat for Humanity). From 2009 to 2011, David served as Co-Chair of the DBA Home Project Committee. David currently serves on the Leopard Lacrosse Board for the Lovejoy Independent School District.

In 2013, David received the Bob Black Bar Leaders Award from the Texas Tech Alumni Association. In 2011, David received the 2011 Outstanding Minority Attorney Award from the Dallas Bar Association. In June, 2010, David was named one of KRLD News Radio's Community Heroes for his work with the DBA Home Project. In September, 2010, David received a City of Dallas Special Recognition from the Dallas City Council for his community involvement and assistance with community outreach programs in South Dallas.

In 2013, 2012 and 2011, David spoke at the State Bar of Texas SOAKING UP SOME CLE: A SOUTH TEXAS LITIGATION COURSE on post-litigation matters, where he presented his articles *Post-Judgment Collection: Getting Your Due from the Devil. How to Collect Like an Angel* and *Post-Judgment Collection: No Day at the Beach*.

David co-authored the articles, *The "feisty" Banks of Durant, Oklahoma*, published in the May/June 2006 PAPER MONEY (Official Journal of the Society of Paper Money Collectors) and *Seized Currency*, published in the September/October 2007 PAPER MONEY (Official Journal of the Society of Paper Money Collectors).

David was born and raised in El Paso, Texas. David received his B.A. from the University of Texas at El Paso in 1995 and his J.D. from the Texas Tech University School of Law in 1999. David served as the Managing Editor of *The Texas Bank Lawyer* at the Texas Tech University School of Law from 1998 to 1999. While in law school, David interned with the Texas Tech University Athletics Compliance Department and served as a member on the NCAA Subcommittee on Governance and Commitment to Rules Compliance.

# The
# Martindale-Hubbell[SM]
# Rating System

# How It Works



LexisNexis
Martindale-Hubbell®

For over 130 years, Martindale-Hubbell® has been the most respected source of authoritative and dependable information about members of the worldwide legal community.

An integral part of this service to the legal community is the Martindale-Hubbell Rating System. Under this system, Legal Ability and General Standards Ratings for individual attorneys are developed and published in the Martindale-Hubbell database. The goal of this impartial rating system is the development of unbiased, fair and accurate ratings for as many lawyers as possible, including both subscribers and nonsubscribers of Martindale-Hubbell.

## ATTORNEY RATINGS

The majority of rating reviews are initiated by Martindale-Hubbell, typically beginning five years after an attorney has been admitted to the Bar. An initial review of a lawyer is also made when requested by the attorney or at the request of a partner or colleague. There are no minimum periods of admission to the practice required for any rating.

There are many lawyers for whom no ratings are published. Some have requested not to have a rating published. For others, definitive information has not been developed because of the relatively few years the lawyer has practiced, the size of the Bar or other reasons unrelated to the individual's professional competence, reliability or ethical standards. If the lawyer's practice is limited or specialized, it may afford little opportunity for others to form a professional opinion. Therefore, absence of ratings should not be construed as unfavorable.

## LAW FIRM RATINGS

Reviews are not conducted of law partnerships or professional corporations. The rating extended to law firms depends on the lawyer personnel and the ratings published for those individuals. Generally, a law firm is given the rating of its highest rated principal. The rating of a firm has no bearing on the individual rating of any lawyer connected with it.

## THE RATING INQUIRY PROCESS

Martindale-Hubbell solicits confidential opinions from members of the Bar, including those who have ratings and those who do not. In addition, members of the Judiciary are queried.

Opinions are solicited via written questionnaires and by Martindale-Hubbell field representatives who conduct on-the-spot, oral interviews. No rating is ever established or altered solely on the basis of a field representative's report. Before definitive action is taken, confidential written inquiries are solicited.

All inquiries seek to elicit recommendations based on personal knowledge of the lawyer under inquiry. Martindale-Hubbell does not undertake to make an evaluation of a lawyer's scholastic background, types of clients represented, the number and kinds of cases handled or participation in professional or community activities. The rating process is recognized as a cooperative service to the Bar; participants are not compensated in any way.

## SCOPE OF THE RATING SYSTEM

Ratings fall into two categories: Legal Ability and General Ethical Standards. A rating must be established in both categories to be published.

### Legal Ability Rating

The *Legal Ability Rating* takes into consideration the standard of ability for the area where the lawyer practices, the attorney's expertise, the nature of practice and qualifications relevant to the profession. Where a lawyer's practice is specialized, rating opinions are made on the basis of performance in those specific fields of law.

Legal Ability Ratings are:

> C – Good to High
> B – High to Very High
> A – Very High to Preeminent

### General Ethical Standards Rating

The *General Ethical Standards Rating* covers adherence to professional standards of conduct and ethics, reliability, diligence and other criteria relevant to the discharge of professional responsibilities.

The General Ethical Standards Rating is:

> V – Very High

An attorney will not receive a Legal Ability Rating unless he or she has been endorsed for a "V". Only when both categories of ratings are confirmed will an attorney receive a rating.

All ratings are positive indicators of an attorney's ethics and professional stature. The CV® rating is a good first rating and a definitive statement of a lawyer's above average ability and unquestionable

ethics. The BV® rating is an excellent rating for the attorney with more experience. The AV® rating is a significant accomplishment — a sign that a lawyer is considered by his or her peers to be at the highest levels of professional excellence.

As a general rule, ratings are transferable within state boundaries. Ratings may also be transferred interstate with the symbol ⊕ indicating the rating was obtained in another jurisdiction.

## PERIODIC RATING REEVALUATION

To maintain a high level of accuracy and dependability, Martindale-Hubbell conducts regular reviews of ratings. If the result does not support the published rating, it is lowered or withdrawn.

## CONFIDENTIALITY

Martindale-Hubbell treats all phases of its impartial rating process as confidential. Sources contacted participate with that understanding. Under no circumstances are any rating materials released.

## PROMOTING YOUR MARTINDALE-HUBBELL RATING

Ratings are intended primarily for the use of lawyers in the practice of their profession and not for the general public. You may reference your Martindale-Hubbell rating in printed lawyer-to-lawyer communications, professional announcements, and legal directories targeted to lawyers and law firms. Listed below are the requirements for each type of communication.

- **For printed lawyer-to-lawyer communications:**
  Include the following:
  *"CV, BV and AV are registered certification marks of Reed Elsevier Properties Inc., used in accordance with the Martindale-Hubbell certification procedure standards and policies."*

- **For printed professional announcements:**
  Include the certification mark reference above AND the following explanation:
  *"Martindale-Hubbell is the facilitator of a peer review process that rates lawyers. Ratings reflect the confidential opinions of members of the Bar and the Judiciary. MARTINDALE-HUBBELL℠ ratings fall into two categories – legal ability and general ethical standards.*

*Legal Ability Ratings are:*

    C – *Good to High*

    B – *High to Very High*

    A – *Very High to Preeminent*

*There is one general ethical standard rating – "V" or "very high" – and an attorney must receive it in order to be rated."*

- **For legal directories targeted to lawyers and law firms:**
  You must receive prior written consent from Martindale-Hubbell Rating Services AND abide by the following policies:
  **Print and CD-ROM based legal directories** must include the certification mark reference and the rating explanation described above.
  **Web-based legal directories** targeted at lawyers and law firms must have a link to Martindale-Hubbell's Web site page (http://www.martindale.com/company/ratings.html) which includes the approved reference and explanation.

You may not use your Martindale-Hubbell rating in print, CD-ROM, or Web-based directories targeted in whole or in part to those other than lawyers and law firms, radio or television commercials, political advertisements or promotions, outdoor advertisements (billboards, buses, benches, etc.), newspaper or yellow page advertisements, law firm Web sites, Martindale-Hubbell Lawyer HomePages or Internet banner ads.

If you'd like to publish your rating in any other format not mentioned here, prior written consent from Martindale-Hubbell Rating Services and adherence to specific guidelines are required.

## A COOPERATIVE SERVICE TO THE BAR

Martindale-Hubbell respects the confidence the legal community has placed in its rating system. Considered an important tool used in the practice of law, the ratings are an invaluable resource for researching opposing counsel or engaging the services of another attorney. They represent a widely regarded measure of esteem that attorneys strive to achieve.

Since ratings reflect the recommendations of the legal community, we need your help to ensure the impartiality of the ratings process. When you receive an inquiry, please complete it and return it to us promptly. By doing so, you are providing a valuable service to the legal community. We extend our appreciation to every member of the legal profession who participates in this cooperative service to the Bar.

# EXHIBIT "B-2"

# TEXAS LAWYER

**NOT FOR REPRINT**

🖨  Click to Print or Select '**Print**' in your browser menu to print this document.

Page printed from: _Texas Lawyer_

# Texas Lawyer's Annual Salary & Billing Report

Jeanne Graham, Texas Lawyer

July 25, 2014

## The Art of Billing: When It Comes to Fees, Firms Keep Options Open

"When they hear a flat fee, they say, 'No problem,' but when I give them an hourly rate, they freak out," said Austin real estate solo Sara Foskitt. Read More.

## Texas Is a Good Place to Be a Paralegal

Paralegals in the Dallas and Houston areas are paid higher hourly wages than the national average, according to the ALM/International Practice Management Association's 2014 Annual Compensation Survey for Paralegals and Managers. Read More.

## Survey Methodology

The 96 firms that participated in this year's survey, which was conducted during June and July, have 3,873 lawyers in Texas. Read More.

## Charts

Average Hours Billed Per Week

Hourly Billing Rates

Timekeepers' Salaries

Legal Secretaries' Salaries

Support Staff Salaries

Administrative Services Salaries

---

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# TEXAS LAWYER

NOT FOR REPRINT

🖶  Click to Print or Select 'Print' in your browser menu to print this document.

Page printed from: _Texas Lawyer_

Texas Lawyer's Annual Salary & Billing Report

# Chart: Average Hours Billed Per Week

Texas Lawyer

July 28, 2014

## AVERAGE HOURS BILLED PER WEEK

| | Equity Partner | | Percent Change | Non-Equity Partner | | Percent Change | Associate | | Percent Change | Legal Assistant | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | 31.5 | 31.0 | 1.6% | 35.0 | 34.6 | 1.2% | 36.0 | 35.0 | 2.9% | 28.0 | 28.0 | 0.0% |
| Median Averages by City | | | | | | | | | | | | |
| Austin/San Antonio | 30.0 | 28.0 | 7.1% | 35.0 | 30.0 | 16.7% | 38.0 | 34.0 | 11.8% | 26.0 | 24.0 | 8.3% |
| Dallas/Fort Worth | 30.0 | 31.0 | -3.2% | 33.5 | 31.5 | 6.3% | 34.5 | 34.5 | 0.0% | 31.0 | 29.0 | 7.1% |
| Houston | 33.8 | 33.8 | 0.0% | 36.0 | 35.9 | 0.3% | 36.0 | 36.0 | 0.0% | 29.0 | 28.9 | 0.3% |
| Other | 30.0 | 30.0 | 0.0% | 36.0 | 36.0 | 0.0% | 38.5 | 38.5 | 0.0% | 28.0 | 28.0 | 0.0% |
| Median Averages by Firm Size | | | | | | | | | | | | |
| 100+ lawyers | 29.0 | 31.0 | -6.5% | 30.8 | 29.8 | 3.4% | 33.0 | 34.0 | -2.9% | 30.0 | 29.0 | 3.4% |
| 50-99 lawyers | 32.3 | 31.3 | 3.2% | 34.8 | 32.3 | 7.7% | 38.3 | 36.3 | 5.5% | 26.9 | 25.1 | 7.2% |
| 30-49 lawyers | 30.2 | 30.0 | 0.5% | 36.0 | 36.0 | 0.1% | 37.5 | 37.0 | 1.4% | 28.5 | 28.5 | 0.2% |
| <30 lawyers | 35.5 | 35.5 | 0.0% | 35.5 | 35.5 | 0.0% | 36.0 | 36.0 | 0.0% | 28.0 | 26.0 | 7.7% |

_Source: 96 firms_

[See related article: _The Art of Billing: When It Comes to Fees, Firms Keep Options Open_

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# TEXAS LAWYER

NOT FOR REPRINT

🖶   Click to Print or Select 'Print' in your browser menu to print this document.

Page printed from: _Texas Lawyer_

Texas Lawyer's Annual Salary & Billing Report

# Chart: Hourly Billing Rates

Texas Lawyer

July 28, 2014

## HOURLY BILLING RATES

| | Equity Partner | | Percent Change | Non-Equity Partner | | Percent Change | 7th-Year Associate | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | $400 | $400 | 0.0% | $326 | $320 | 1.9% | $295 | $280 | 5.4% |
| **Median Averages by City** | | | | | | | | | |
| Austin/San Antonio | $441 | $417 | 5.8% | $326 | $326 | 0.0% | $295 | $280 | 5.4% |
| Dallas/Fort Worth | $450 | $450 | 0.0% | $350 | $345 | 1.4% | $295 | $293 | 0.9% |
| Houston | $375 | $370 | 1.4% | $325 | $325 | 0.0% | $304 | $295 | 3.1% |
| Other | $325 | $325 | 0.0% | $253 | $250 | 1.2% | $195 | $185 | 5.4% |
| **Median Averages by Firm Size** | | | | | | | | | |
| 100+ lawyers | $475 | $459 | 3.5% | $387 | $377 | 2.7% | $351 | $340 | 3.2% |
| 50-99 lawyers | $421 | $409 | 2.9% | $338 | $333 | 1.5% | $285 | $280 | 1.8% |
| 30-49 lawyers | $389 | $372 | 4.6% | $326 | $298 | 9.6% | $243 | $230 | 5.7% |
| <30 lawyers | $363 | $358 | 1.4% | $295 | $295 | 0.0% | $263 | $263 | 0.0% |

| | 4th-Year Associate | | Percent Change | 1st-Year Associate | | Percent Change | Sr. Legal Assistant | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | $240 | $240 | 0.0% | $200 | $200 | 0.0% | $130 | $130 | 0.0% |
| **Median Averages by City** | | | | | | | | | |
| Austin/San Antonio | $230 | $245 | -6.1% | $200 | $200 | 0.0% | $151 | $148 | 2.0% |
| Dallas/Fort Worth | $254 | $248 | 2.4% | $240 | $225 | 6.7% | $150 | $150 | 0.0% |
| Houston | $240 | $240 | 0.0% | $175 | $175 | 0.0% | $119 | $114 | 4.4% |
| Other | $200 | $200 | 0.0% | $185 | $178 | 4.2% | $95 | $95 | 0.0% |
| **Median Averages by Firm Size** | | | | | | | | | |
| 100+ lawyers | $325 | $315 | 3.2% | $290 | $277 | 4.7% | $210 | $201 | 4.5% |
| 50-99 lawyers | $234 | $240 | -2.7% | $200 | $200 | 0.0% | $151 | $148 | 2.0% |
| 30-49 lawyers | $225 | $210 | 7.1% | $178 | $162 | 9.6% | $129 | $129 | 0.0% |
| <30 lawyers | $225 | $225 | 0.0% | $195 | $190 | 2.6% | $105 | $100 | 5.0% |

_Source: 96 firms_

[See related article: _The Art of Billing: When It Comes to Fees, Firms Keep Options Open_

# TEXAS LAWYER

NOT FOR REPRINT

🖶   Click to Print or Select 'Print' in your browser menu to print this document.

Page printed from: _Texas Lawyer_

Texas Lawyer's Annual Salary & Billing Report

# Chart: Timekeepers' Salaries

Texas Lawyer

July 28, 2014

## TIMEKEEPERS' SALARIES

| | 7th-Year Associate | | Percent Change | 4th-Year Associate | | Percent Change | 1st-Year Associate | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | $130,000 | $123,500 | 5.3% | $116,000 | $110,000 | 5.5% | $90,000 | $88,000 | 2.3% |
| **Median Averages By City** | | | | | | | | | |
| Austin/San Antonio | $140,000 | $138,000 | 1.4% | $135,000 | $135,000 | 0.0% | $130,000 | $130,000 | 0.0% |
| Dallas/Fort Worth | $155,000 | $148,000 | 4.7% | $120,000 | $111,750 | 7.4% | $92,500 | $92,500 | 0.0% |
| Houston | $128,500 | $123,500 | 4.0% | $109,000 | $106,500 | 2.3% | $87,500 | $87,500 | 0.0% |
| Other | $101,250 | $95,500 | 6.0% | $88,500 | $87,500 | 1.1% | $68,500 | $70,000 | -2.1% |
| **Median Averages By Firm Size** | | | | | | | | | |
| 100+ lawyers | $210,000 | $198,050 | 6.0% | $170,000 | $158,400 | 7.3% | $147,500 | $147,500 | 0.0% |
| 50-99 lawyers | $140,000 | $137,250 | 2.0% | $135,000 | $130,000 | 3.8% | $130,000 | $130,000 | 0.0% |
| 30-49 lawyers | $108,476 | $107,500 | 0.9% | $109,798 | $106,600 | 3.0% | $89,500 | $89,000 | 0.6% |
| <30 lawyers | $115,000 | $110,000 | 4.5% | $90,000 | $85,000 | 5.9% | $72,000 | $75,000 | -4.0% |
| | Legal Assistant 7+ Years of Experience | | Percent Change | Legal Assistant 4-6 Years of Experience | | Percent Change | Legal Assistant 1-3 Years of Experience | | Percent Change |
| | 2013 | 2012 | | 2013 | 2012 | | 2013 | 2012 | |
| Survey Median Averages | $69,367 | $68,000 | 2.0% | $55,500 | $52,667 | 5.4% | $43,000 | $41,500 | 3.6% |
| **Median Averages By City** | | | | | | | | | |
| Austin/San Antonio | $68,207 | $67,774 | 0.6% | $66,500 | $66,250 | 0.4% | $47,048 | $46,000 | 2.3% |
| Dallas/Fort Worth | $75,533 | $74,975 | 0.7% | $60,600 | $61,467 | -1.4% | $47,048 | $47,048 | 0.0% |
| Houston | $72,500 | $68,900 | 5.2% | $55,500 | $50,600 | 9.7% | $47,048 | $47,048 | 0.0% |
| Other | $53,138 | $51,039 | 4.1% | $39,438 | $39,000 | 1.1% | $36,000 | $36,000 | 0.0% |
| **Median Averages By Firm Size** | | | | | | | | | |
| 100+ lawyers | $74,917 | $73,688 | 1.7% | $53,644 | $52,798 | 1.6% | $39,924 | $38,924 | 2.6% |
| 50-99 lawyers | $66,500 | $66,500 | 0.0% | $58,250 | $58,000 | 0.4% | * | * | * |
| 30-49 lawyers | $68,725 | $65,825 | 4.4% | $57,788 | $54,834 | 5.4% | $45,624 | $44,874 | 1.7% |
| <30 lawyers | $70,500 | $68,000 | 3.7% | $55,500 | $50,600 | 9.7% | $37,000 | $36,000 | 2.8% |

*Data not available
Source: 96 firms.

[See related article: _The Art of Billing: When It Comes to Fees, Firms Keep Options Open_

# TEXAS LAWYER

**NOT FOR REPRINT**

🖶   Click to Print or Select '**Print**' in your browser menu to print this document.

Page printed from: *Texas Lawyer*

Texas Lawyer's Annual Salary & Billing Report

# Chart: Legal Secretaries' Salaries

Texas Lawyer

July 28, 2014

## LEGAL SECRETARIES' SALARIES

| | 7+ Years Experience | | Percent Change | 4-6 Years Experience | | Percent Change | 1-3 Years Experience | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| **Survey Median Averages** | $58,145 | $56,205 | 3.5% | $48,480 | $47,525 | 2.0% | $40,000 | $40,000 | 0.0% |
| **Median Averages by City** | | | | | | | | | |
| Austin/San Antonio | $56,310 | $56,038 | 0.5% | $48,480 | $47,525 | 2.0% | $57,300 | $56,700 | 1.1% |
| Dallas/Fort Worth | $60,235 | $60,000 | 0.4% | $47,000 | $39,800 | 18.1% | $36,950 | $36,500 | 1.2% |
| Houston | $58,145 | $56,370 | 3.1% | $51,744 | $50,000 | 3.5% | $45,000 | $42,500 | 5.9% |
| Other | $45,271 | $43,638 | 3.7% | $38,000 | $37,000 | 2.7% | $26,622 | $25,588 | 4.0% |
| **Median Averages by Firm Size** | | | | | | | | | |
| 100+ lawyers | $60,235 | $59,645 | 1.0% | $45,000 | $41,500 | 8.4% | $32,800 | $31,500 | 4.1% |
| 50-99 lawyers | $57,154 | $55,518 | 2.9% | $50,000 | $50,000 | 0.0% | $48,584 | $48,334 | 0.5% |
| 30-49 lawyers | $56,430 | $53,948 | 4.6% | $42,750 | $40,000 | 6.9% | $33,900 | $33,000 | 2.7% |
| <30 lawyers | $59,073 | $58,185 | 1.5% | $47,872 | $45,877 | 4.3% | $39,000 | $36,500 | 6.8% |

*Source: 96 firms.*

[*See related article:* *The Art of Billing: When It Comes to Fees, Firms Keep Options Open*

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# TEXAS LAWYER

NOT FOR REPRINT

🖶   Click to Print or Select 'Print' in your browser menu to print this document.

Page printed from: *Texas Lawyer*

Texas Lawyer's Annual Salary & Billing Report

# Chart: Support Staff Salaries

Texas Lawyer

July 28, 2014

## SUPPORT STAFF SALARIES

| | Information Services Manager | | Percent Change | Librarian | | Percent Change | Marketing Director | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | $113,139 | $109,844 | 3.0% | $56,120 | $55,795 | 0.6% | $92,000 | $89,250 | 3.1% |
| **Median Averages By City** | | | | | | | | | |
| Austin/San Antonio | $122,500 | $120,750 | 1.4% | $55,000 | $52,500 | 4.8% | $111,000 | $109,250 | 1.6% |
| Dallas/Fort Worth | $100,000 | $91,000 | 9.9% | $77,750 | $74,750 | 4.0% | $87,000 | $83,500 | 4.2% |
| Houston | $151,925 | $147,500 | 3.0% | $61,959 | $59,410 | 4.3% | $168,500 | $165,000 | 2.1% |
| Other | $113,139 | $109,844 | 3.0% | $56,120 | $55,795 | 0.6% | | | |
| **Median Averages by Firm Size** | | | | | | | | | |
| 100+ lawyers | $152,500 | $150,000 | 1.7% | $72,500 | $68,500 | 5.8% | $97,000 | $95,000 | 2.1% |
| 50-99 lawyers | $115,000 | $111,500 | 3.1% | $53,339 | $53,339 | 0.0% | $107,925 | $107,520 | 0.4% |
| 30-49 lawyers | $101,570 | $99,922 | 1.6% | $56,120 | $55,795 | 0.6% | * | * | |
| <30 lawyers | $100,000 | $92,000 | 8.7% | $55,000 | $52,500 | 4.8% | $65,000 | $65,000 | 0.0% |

* Data not available.
Source: 96 firms.

[See related article: *The Art of Billing: When It Comes to Fees, Firms Keep Options Open*

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# TEXAS LAWYER

**NOT FOR REPRINT**

🖶  Click to Print or Select '**Print**' in your browser menu to print this document.

Page printed from: _Texas Lawyer_

Texas Lawyer's Annual Salary & Billing Report

# Chart: Administrative Services Salaries

Texas Lawyer

July 28, 2014

## ADMINISTRATIVE SERVICES SALARIES

| | Chief Administrator | | Percent Change | Office Manager | | Percent Change | Finance Director | | Percent Change | Personnel Director | | Percent Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | | 2014 | 2013 | |
| Survey Median Averages | $120,000 | $120,000 | 0.0% | $71,750 | $69,000 | 4.0% | $120,000 | $115,000 | 4.3% | $82,000 | $80,000 | 2.5% |
| **Median Averages by City** | | | | | | | | | | | | |
| Austin/San Antonio | $152,000 | $152,000 | 0.0% | $71,714 | $67,351 | 6.5% | $120,000 | $115,000 | 4.3% | $82,000 | $80,000 | 2.5% |
| Dallas/Fort Worth | $154,000 | $150,000 | 2.7% | $71,750 | $69,000 | 4.0% | $100,900 | $98,000 | 3.0% | $95,000 | $88,000 | 8.0% |
| Houston | $110,000 | $98,500 | 11.7% | $72,589 | $69,351 | 4.7% | $123,750 | $121,000 | 2.3% | $95,000 | $88,000 | 8.0% |
| Other | $101,378 | $97,479 | 4.0% | $59,000 | $57,250 | 3.1% | * | * | * | $80,929 | $79,576 | 1.7% |
| **Median Averages by Firm Size** | | | | | | | | | | | | |
| 100+ lawyers | $167,500 | $160,000 | 4.7% | $72,589 | $69,351 | 4.7% | $123,750 | $121,000 | 2.3% | $97,500 | $91,500 | 6.6% |
| 50-99 lawyers | $131,000 | $126,000 | 4.0% | * | * | * | $98,376 | $94,544 | 4.1% | $81,425 | $78,875 | 3.2% |
| 30-49 lawyers | $144,984 | $143,150 | 1.3% | $73,500 | $71,250 | 3.2% | $94,700 | $90,000 | 5.2% | $73,765 | $71,438 | 3.3% |
| <30 lawyers | $67,500 | $66,500 | 1.5% | $59,000 | $57,250 | 3.1% | * | * | * | * | * | * |

*Data not available
Source: 96 firms

[See related article: _The Art of Billing: When It Comes to Fees, Firms Keep Options Open_

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# The Future of FEES

## Is Alternative Billing Becoming the Norm?

by JEANNE GRAHAM
jgraham@alm.com
@JeanneGraham

When patent and commercial litigation firm Buether Joe & Carpenter first opened its doors in February of 2010, the firm billed all its business by the hour. Now, three and a half years later, the Dallas firm only bills about 25 percent of its business by the hour, and has a goal of eliminating hourly fees all together, says member Chris Joe.

"We have done flat fee deals, we've done monthly set fees, we've done partial hourly with a contingency kicker," Joe says. "We're open to just about anything for our client. If you can think of it, we've thought about it or we've done it."

Alternative, or non-hourly billing, is used by 89 percent or 82 of the 92 firms that responded to *Texas Lawyer's* 2013 Salary and Billing Survey. While the firms are balancing the risk and reward of alternative billing, 80 percent are also offering discount fees or rates to their clients. [See chart "*Percentage of Firms Using Discounted or Alternative Billing Methods*," below].

Discounting and alternative billing are not the sole purview of large firms charging $500 plus per hour. Small firms are also finding ways to use creative billing strategies and discount methods.

► see Is Alternative, page 20



**PERCENTAGE OF FIRMS USING DISCOUNTED OR ALTERNATIVE BILLING METHODS**

| Method | Percentage |
| --- | --- |
| Discounted | 80 |
| Flat/fixed fees | 61 |
| Contingent fees | 38 |
| Blended fees | 30 |
| None | 11 |

*Note: Percentage sum exceeds 100 percent because most of the firms using alternative billing use more than one method. Source: 92 firms.*

Chris Joe, member in Buether Joe & Carpenter

► see MOUNTAINS, page 16

Salary & Billing Survey 2013

INSIDE

Seven Texas firms top large deal stats

Asking the right questions can lead to success

Is your firm truly entrepreneurial?

JULY 29, 2013

# Is Alternative Billing Becoming the Norm?

▼ *continued from page 1*

"We're certainly open to some discounting, it just depends on each case," Joe says. "We do provide some volume discounting for long-time clients who send all their business to us. If we have a commitment to get business from the client, we will provide them with that deal."

The firm has grown from its initial three lawyers to nine lawyers. Joe predicts a strong revenue increase for 2013.

"We're halfway through the year and have already surpassed last year's gross revenues," he says. "The firm doubled its revenue in 2012 compared to 2011 and is on track to double it again this year."

Intellectual property and patent litigation firm Skiermont Puckett does almost no hourly billing. The firm was formed two years ago, in July 2011, by Paul Skiermont and Donald

Puckett. Now the Dallas firm has ten lawyers.

"We have a couple of defense-side clients that do prefer hourly billing," says partner Skiermont. "If a client is going to insist in paying by the hour, we are not at the point yet to insist on a particular form of payment."

The boutique does both plaintiff and defense work, Skiermont says. Firm



**Paul Skiermont**

fees have remained relatively constant since opening its doors. During its first few months, when the firm was trying to get established, it offered some discounting to build its customer base, he says.

"After the first six months or so, although every fee agreement is different, all are geared toward the same type of fee structure and amount for the firm," Skiermont says.

The firm does no volume discounting, since it usually is handling just one matter per client, he says. Where Skiermont Puckett uses discounting is when the firm is negotiating a fee agreement with a client and determining the amount, or percentage of the fee, that will be held back and paid upon the firm's success.

"We try to put some of our skin in the game, so that when the client

---

**Salary & Billing Survey 2013**

---

> **Alternative, or non-hourly billing, is used by 89 percent or 82 of the 92 firms that responded to *Texas Lawyer's* 2013 Salary and Billing Survey.**

---

## We Set Out to Build a Force to be Reckoned with...






firm," Skiermont says.

The firm does no volume discounting, since it usually is handling just one matter per client, he says. Where Skiermont Puckett uses discounting "is when the firm is negotiating a fee agreement with a client and determining the amount, or percentage of the fee, that will be held back and paid upon the firm's success.

"We try to put some of our skin in the game, so that when the client wins, or does better, we do better," he says. The firm expects 2013 revenue to exceed 2012 and is looking at adding one or two more lawyers this year, he says.

For those firms using hourly billing rates, median increases in hourly rates for firms participating in the survey ranged from zero percent for first-year associates to 4 percent for fourth-year associates. [See chart "Hourly Billing Rates" page 22].

MacIntyre McCulloch Stanfield Young in Houston is an eight-lawyer boutique firm that is almost seven years old and handles probate, trusts and guardianships. The firm bills 90 to 95 percent of its business on an hourly basis, says partner Robert MacIntyre.

**Robert MacIntyre**

"We have a couple of contingency cases, and we do some work on a flat fee, but not a lot."

The firm might quote a client a flat fee for a package that includes wills, powers of attorney, medical powers of attorney, and other documents, he says. Each of the firm's partners decided whether to increase their hourly



20 Years Later, Look Who We've Become.

*Tough Name. Tougher Opponent.*

AHMAD
ZAVITSANOS
ANAIPAKOS
ALAVI
MENSING

AZA

1221 McKinney, Suite 3460
Houston, Texas 77010
azalaw.com

rates for 2013, he says. Rates that did increase were less than five percent, says MacIntyre.

The firm discounts some business — on individual cases where warranted — or when working with banks and trust companies that administer trusts.

"We do a lot of work with a couple of banks and trust companies in town," MacIntyre says.

MacIntyre predicts the firm's 2013 revenue will be greater than its 2012 revenue. He notes the firm is not opposed to alternative billing, but says it is just not requested by clients. "I believe that every billing situation should be responsive or compatible with the circumstances of the dispute," he says. "And so if it requires flexibility or creativity we are certainly amenable to that."

Eighteen months ago, two-lawyer firm Glenn Adams and Associates in McKinney, began charging by the hour for its family law matters. Traditionally, the firm, which has been in business for about 20 years, charged all matters on a flat fee basis, says partner Lindsey Pruitt. The firm's business is half criminal defense law and half family law, she says. Pruitt says that the flat rates were too low for the work the firm was doing handling divorces, child custody cases and other family law matters.

Although it's hard to predict the firm's annual revenue, the firm generated more revenue during the first six months of 2013 than it did during the same period in 2012, she says.

"With the criminal law matters we always just charge flat rates, depending on whether or not it goes to trial," she says.

The firm will offer a discount, for example, if a client has several criminal cases and they can be bundled together, she says.

"Sometimes it's needs-based," she says.

## SURVEY METHODOLOGY

Each year, Texas Lawyer tracks financial trends in the state's legal industry through its Salary & Billing Survey. The resulting report compiles information provided by firms of different sizes and practice areas across the state. The firms respond to questions about employees' salaries, billing rates and billable hours.

Due to variations in firms' data-tracking, these results are not definitive, but they do provide valuable comparative information for firm managers and employees. Not all respondents answered each question. A minimum of three responses was required for every category of averaged data. The averages reported are median averages, meaning the data were arranged in ascending order with the midpoint reported in each category. Using the median number balances out survey responses that might be much higher or lower than what most of the firms reported. The numbers in the percent-change columns are rounded to the nearest tenth of a percent.

says. "If somebody comes in, and they're on hard times, we'll give them a break."

See related charts, pages 22-24.

The 92 firms that participated in this year's survey, which was conducted during June, have 8,363 lawyers with 5,167 of those lawyers in Texas. The survey results are reported by city and by firm size. The firms with lawyers outside Texas provided salaries and billing rates for their Texas offices.

Firms are divided into four regional categories: Austin/San Antonio, Dallas/Fort Worth, Houston and other. For the 92 responding firms, the primary Texas locations are as follows: 10 are in Austin/San Antonio, 39 are in Dallas/Fort Worth, 25 are in Houston and 18 are in other cities. The size divisions are firms with 100-plus, 50 to 99, 30 to 49 and fewer than 30 lawyers. Of the 92 responding firms, 13 have more than 100 lawyers, 12 have 50-99 lawyers, 24 have 30-49 lawyers and 42 have fewer than 30 lawyers.

The firm's responding to this year's survey also provided 2012 data.

To be added to Texas Lawyer's email survey list, contact research editor Jeanne Graham at jgraham@alm.com.

**Lindsey Pruitt**



TEXAS LAWYER presents

# Domestic Relations

## How to Make Your Case in Family Court